# IN THE SUPREME COURT OF IOWA

No. 07–0237

Filed September 18, 2009

**STATE OF IOWA,**

Appellee,

vs.

**EDWIN BELLO PAREDES,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Douglas S. Russell, Judge.

Defendant challenges conviction based on the district court's exclusion of statements against penal interest made by another suspect. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED**.

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Assistant Attorney General, Janet M. Lyness, County Attorney, and Anne M. Lahey, Assistant County Attorney, for appellee.

**APPEL, Justice.**

Edwin Paredes appeals his conviction for child endangerment resulting in serious injury. The charges arose after his infant child was diagnosed with shaken-baby syndrome. Paredes claims that the district court erred in excluding hearsay statements made by the child's mother that she "may have" caused the baby's injuries. The court of appeals affirmed Paredes' conviction. For the reasons expressed below, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

## I. Background Facts and Prior Proceedings.

Paredes and Cassidy Millard are the parents of a young infant. At the time of the events relevant to this proceeding, Paredes was twenty-four years old, Millard was sixteen years old, and the baby was two months old. The family was living in the home of Paredes' sister, Wendy Jimenez, in Coralville, Iowa.

After being seen by a physician on Saturday, April 23, 2005 for what appeared to be a routine ear infection, the baby's condition deteriorated. On Sunday, after consulting with the child's physician, Millard called for an ambulance to take the infant to a local hospital. Police officers arrived at the residence shortly thereafter. Upon arrival of the police officers, Paredes was defensive, asking the officers, "What are you doing here?" and declaring, "This is not a domestic." Paredes remained at home while Millard accompanied the child to the hospital.

At the hospital, medical personnel diagnosed the baby with shaken-baby syndrome. The fact that the infant was not properly diagnosed on Saturday when the child was seen by a physician was explained by the developing nature of shaken-baby syndrome symptoms. At first, the symptoms are general irritability, excessive crying, and

trouble feeding. These symptoms then progress to more severe problems, including periodic seizures. Based on the onset of the seizures, medical personnel determined that the injury occurred sometime between late Friday and early Saturday morning. As mandatory reporters, hospital staff contacted the Iowa Department of Human Services (DHS) to report the suspected abuse.

On Sunday evening, Chad Bollweg of DHS and Coralville Police Detective Robbie Swank met with Paredes and Millard. Both denied any knowledge of how the child was injured. They did admit, however, that they were the child's only caregivers during the period in question, except for a brief fifteen-minute period when Paredes' sister cared for the baby.

On Monday, Bollweg and another social worker, Vicky Leau, met with the couple. Leau informed the parents that all future visits with the child would have to be supervised. Upon hearing this, Paredes declared that supervised visits would not be necessary—he caused the injuries. Leau wondered whether Paredes "was just saying that so that Cassidy could be unsupervised and spend more time at the hospital." Millard commented that Paredes should not say something simply for her sake.

Paredes, nevertheless, claimed he was watching the child while Millard was outside smoking and shook the baby when it would not stop crying. He later performed a reenactment. Paredes repeated the story to Detective Swank and Bollweg and signed a written statement detailing the incident and declaring his remorse. He was not immediately arrested.

On Tuesday, Paredes again met with Detective Swank. At that time, Paredes asked Swank whether anyone ever testified falsely in order to protect someone else and whether the detective thought he had hurt the baby. Swank responded by asking Paredes if he was denying

shaking the baby. Paredes then denied shaking the infant. Swank told Paredes he did not appreciate him "treating this like a game" and asked for the truth.

At this point, Paredes returned to his initial claim and once again asserted that he injured the child. He stated he was afraid of going to jail. Paredes suggested that he and Millard should not have admitted they were the only caregivers and instead should have pointed the finger at some of the older kids in the home. Paredes apologized for his inconsistencies.

On May 1, Millard called a social worker, Susan Gail, with whom she had prior contact. Because of the nature of the call, Gail memorialized the contents of the conversation. According to Gail's memorandum, Millard told her that Millard's child had shaken-baby syndrome. When Gail asked Millard what had happened, Millard responded:

> She said she did not know, but her boyfriend (Edwin, I think) was in jail for it. She said that he did not do it, though. She then asked me if her diagnosis was Multiple Personality Disorder, because sometimes she doesn't remember what she does. I asked her if she meant like the time she threatened to kill/stab me. (This was when she was in Valley Shelter 2 years ago.) She said yes, that's what I mean.

Gail told Millard that she did not believe Millard had been diagnosed as having Multiple Personality Disorder, but questioned Millard as to why Millard would pose such a question. According to the Gail memorandum, Millard responded:

> She told me she knows Edwin would not hurt the baby and hinted around that maybe she did it, but didn't remember. I asked about the day that it happened. I asked her if the baby was crying. She told me that he cried all the time, he was colicky [*sic*]. She said that she just yelled at him to "shut up", but never hit him. She then said that she had started spanking him lately, but that it did not hurt him since he had on a big diaper.

The Gail memorandum further states:

> Cassidy was afraid that if she told that she might have done it, she would go to prison when she is 18. I told her that she needed to talk to her attorney. I told her that she would not get the baby back and she said that she knew that. She asked me what would happen to her if it was found that she did hurt the baby. I told her that I didn't know, but more than likely she would go to Toledo until she turned 18.

After discussing the condition of the child, the Gail memorandum indicates that she and Millard further discussed Millard's situation:

> Cassidy told me that she has been crying for a week because she does not want her boyfriend to take the fall for this. She said that he is not that kind of guy, not violent. She said that Edwin didn't even take care of the baby that much. She kept saying, "if I did it."

At this point, Gail continued to talk to Millard as if she did do it and was not contradicted. Gail again advised Millard to contact her attorney.

Gail contacted her supervisor about the conversation and forwarded a copy of the memorandum by e-mail to her. The e-mail was then forwarded to Detective Swank. Although Detective Swank spoke with Gail by telephone, he did not interview Millard again. On May 5, the State charged Paredes with child endangerment resulting in serious injury in violation of Iowa Code section 726.6(1)(*b*) (2003).

On the day of trial, the State filed a motion in limine to exclude Gail's testimony regarding her conversation with Millard as impermissible hearsay. The motion in limine was considered in chambers, with only a brief record made after the fact. On the record, the State argued that Gail's testimony would constitute inadmissible hearsay. Paredes' counsel did not specifically respond to the State's argument. The court orally sustained the motion.

The next day, Paredes filed a motion to reconsider. Paredes urged that he be allowed to question Detective Swank and DHS employee Bollweg about the memorandum, its contents, and their responses to it.

Paredes stated that he was not presenting the evidence for the truth of the matter asserted, but instead argued that the actions of Swank and Bollweg in response to the Gail memorandum revealed the existence of another suspect in the case.

After allowing oral argument on the motion to reconsider, the district court denied it. In a ruling on the record, the district court held that the statements made by Millard in the memorandum were out-of-court statements by a declarant who was unavailable to testify. The district court further concluded that the statements did not meet the hearsay exception for statements against interest under Iowa Rule of Evidence 5.804(*b*)(3).

In support of its conclusion, the court found that the statements attributed to Millard would not subject her to criminal liability, but were statements about hypothetical guilt or hypothetical punishments if guilt were established or an admission were made. Further, the district court ruled that there were insufficient corroborating circumstances under rule 5.804(*b*)(3) to allow admission of the statements.

Paredes was convicted at trial. On appeal, the court of appeals affirmed his conviction. The court of appeals concluded that because the district court ruled on the issue, the admissibility of Millard's statements was preserved. On the merits of the claim, however, the court of appeals concluded that Paredes failed to show that Millard was unavailable for trial, a prerequisite for admission of statements against interest under rule 5.804(*b*)(3). We granted further review.

## II. Standard of Review.

A district court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion. *State v. Jordan*, 663 N.W.2d 877, 879 (Iowa 2003). This court, however, reviews hearsay claims for

correction of errors at law. *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006). This standard of review extends to determining whether statements come within an exception to the general prohibition on hearsay evidence, including the exception for statements against interest. *State v. Hallum*, 585 N.W.2d 249, 254 (Iowa 1998), *vacated on other grounds by Hallum v. Iowa*, 527 U.S. 1001, 119 S. Ct. 2335, 144 L. Ed. 2d 233 (1999).

### III.  Preservation of Error.

Preliminarily, we must address two preservation of error issues. The State claims that Paredes has failed to preserve the issue he now seeks to raise on appeal, namely, the admissibility of Millard's statements as statements against interest. Paredes conversely asserts that the State failed to preserve the issue of Millard's unavailability, an issue which the court of appeals held prevented Paredes from offering her out-of-court statements for the truth of the matter asserted.

The essence of the State's argument is that Paredes has improperly switched horses in midstream. At trial, the State claims, Paredes did not specifically assert that Millard's statements to Gail were admissible as statements against interest. Instead, the State suggests that Paredes offered the evidence only for a narrow purpose—to show the responsive conduct of Detective Swank, i.e., to demonstrate that the detective was sufficiently concerned by the statements to have had at least some doubts as to whether they had arrested the right person.

We disagree with the State's contention. When Paredes listed Gail as a witness, it must have been obvious to the prosecution that Paredes sought to introduce Millard's statements to Gail for the truth of the matter asserted on the ground that they amounted to statements against interest. The State conceded as much before the court of appeals.

While Paredes did not specify that ground in the reported oral argument on the motion in limine and the district court's order granting the original motion is cryptic, the district court in its ruling for reconsideration squarely addressed the question of whether Millard's statements qualified as statements against interest and whether there were sufficient corroborating circumstances to support their admission. We have previously held that where a question is obvious and ruled upon by the district court, the issue is adequately preserved. *State v. Williams*, 695 N.W.2d 23, 27–28 (Iowa 2005). As a result, we hold that the exclusion of Millard's statements was sufficiently preserved for appeal.[1]

On the other hand, we hold that the State has not preserved the issue of Millard's unavailability to testify at trial. While the court of appeals decided in favor of the State on this ground, the State did not raise the issue in its appellate brief. At oral argument before this court, counsel for the State candidly and properly conceded that the issue had been waived. We agree and decline to preserve an issue which the State has not raised in brief and concedes is not properly before the court.

**IV. Admissibility of Statements.**

**A. Introduction.** This appeal focuses on the proper interpretation of Iowa Rule of Evidence 5.804(*b*)(3), which creates an exception to the general prohibition against hearsay statements. This rule provides for the introduction of:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal

---

[1]Counsel should develop a clear record at trial rather than assume that the district court will rule on the issue and that an appellate court will find that the issue was obvious to trial participants. By failing to make a clear record, counsel takes an unnecessary risk that the issue, which could be vital to the prosecution or defense, will not be preserved.

liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Our rule of evidence is identical in all relevant aspects to its federal counterpart, Federal Rule of Evidence 804(*b*)(3). As a result, interpretations of the federal rule are often persuasive authority for interpretation of our state rule. *State v. Dullard*, 668 N.W.2d 585, 593 (Iowa 2003). Federal case law, however, is not binding, and we are free to develop our own approach to legal questions under the Iowa rule.

In this case, Paredes claims that the trial court should have admitted the various statements made by Millard to Gail as statements against interest under rule 5.804(*b*)(3). Paredes claims that admissible statements made by Millard include: her statement that she had begun spanking her two-month-old baby, her statement that Paredes did not hurt the baby and her hinting that maybe she was responsible, her statement that she did not want Paredes to take the fall, her questions and comments about criminal penalties, and her silence or lack of contradiction when Gail spoke to her as if she were the perpetrator.

Paredes further asserts that the statements were sufficiently corroborated under the totality of facts and circumstances to require their admission into evidence. Paredes notes that he and Millard were the child's only caregivers during the time when the injuries were inflicted. Paredes points to testimony that Millard's demeanor during the ride to the hospital was not quite what one would expect of a new mother's reaction under the circumstances. Paredes also observes that Millard attempted to shift blame to her sister-in-law, Jimenez. Jimenez, however, testified that she had observed Millard treat the infant

inappropriately, including shaking him prior to his admission to the hospital. All these circumstances, according to Paredes, tend to corroborate Millard's inculpatory statements. Finally, Paredes asserts that the failure to allow admission of Millard's statements was not harmless, requiring reversal of his conviction.

The State counters that Millard's statements were not sufficiently inculpatory that a reasonable person in her position would not have made them unless they were true. The State stresses that Millard, in fact, did not admit to anything. The State argues that Millard spoke only hypothetically and that she was primarily upset because she did not want her boyfriend to take the fall. Rather than admitting guilt, the State contends that Millard, if anything, was offering a mental illness defense of diminished responsibility or not guilty by reason of insanity, which would preclude her from criminal liability.

In addition, the State contends that even if Millard made statements adverse to her penal interest, there was insufficient corroboration of her claims to allow their admission. The State notes that Millard's statements, which were made a week after the assault and after she had numerous opportunities to acknowledge her role but did not do so, amounted to vague comments of the "maybe I did, maybe I didn't variety," provided no details regarding her alleged mental problems that caused her to forget her culpability, were not made under oath, reflected not an admission as much as an effort to escape criminal liability, and were motivated primarily by a desire to clear her boyfriend while still avoiding punishment herself.

In order to understand the context of this dispute, we survey the common-law approach to admission of hearsay statements against penal interest, the history of the development of the federal rule, and the

subsequent case law that has developed under the federal rule and substantially similar state rules.

**B. Common-Law Approach.** At common law, the hearsay rule was more broadly applied than is the case under modern practice. The historical underpinnings of the hearsay rule were concerns about reliability and trustworthiness of statements that were not made under oath and were "not subject to cross-examination by opposing counsel to test the perception, memory, veracity, and articulateness of the out-of-court declarant." Emily F. Duck, *The* Williamson *Standard for the Exception to the Rule Against Hearsay for Statements Against Penal Interest*, 85 J. Crim. L. & Criminology 1084, 1085 (1995) [hereinafter Duck].

Over time, however, exceptions to the hearsay rule began to develop in the common law when statements displayed sufficient indicia of reliability. *Id.* In particular, the common law began to recognize that statements against pecuniary or proprietary interest were generally trustworthy. *Id.* at 1086. The rationale behind these developing exceptions was the notion that a reasonable person would not make a statement against his pecuniary or proprietary interest unless the statement was true. *Id.*

The common law, however, refused to allow admission of hearsay statements against penal interest. *Id.* In a much cited case, the House of Lords in *The Sussex Peerage*, 8 Eng. Rep. 1034 (H.L. 1844), refused to allow into evidence a statement against penal interest. Such common-law opinions cited concern that declarations against penal interest might be collateral to the main statement, may be motivated by a desire to curry favor with authorities, or may be designed to lessen the culpability of the declarant by shifting most of the blame for the criminal offense to

another.  *Id.*; Andrew R. Keller, Note, *Inculpatory Statements Against Penal Interest and the Confrontation Clause*, 83 Colum. L. Rev. 159, 162 (1983) [hereinafter Keller].

In 1913, the United States Supreme Court considered the admissibility of statements against penal interest in *Donnelly v. United States*, 228 U.S. 243, 33 S. Ct. 449, 57 L. Ed. 820 (1913).  Over a dissent by Justice Oliver Wendell Holmes, the majority in a cursory opinion adopted the common-law rule of excluding such statements, apparently concluding that the approach in *The Sussex Peerage* was not worthy of reexamination.  *Donnelly*, 228 U.S. at 273–76, 33 S. Ct. at 459–60, 57 L. Ed. at 833–34.

The common-law approach—a blanket exclusion of hearsay statements against penal interest—had the advantage of providing a clear rule that was easy to apply.  But the one-size-fits-all rule also had the potential of producing injustice in particular cases.  While some statements against penal interest may be highly suspect, others seem highly probative.  As noted in Justice Holmes' dissent, "[N]o other statement is so much against interest as a confession of murder."  *Id.* at 278, 33 S. Ct. at 461, 57 L. Ed. at 834 (Holmes, J., dissenting).

If the purpose of a dissent is to influence the future direction of the law, Holmes' dissent in *Donnelly* was a success.  Subsequent academic writers attacked the common-law rule barring admission of hearsay statements against penal interest.  Failure to include at least some statements against penal interest was assailed as a "nuisance" by John H. Wigmore and lacking in rational consistency by Edmond M. Morgan. David Robinson, Jr., *From Fat Tony and Matty the Horse to the Sad Case of A.T.: Defensive and Offensive Use of Hearsay Evidence in Criminal Cases,* 32 Hous. L. Rev. 895, 898 nn. 8–9 (1995).  While the approach in

*Donnelly* continued to be applied by many American courts, the stage was set for a change.

**C.    Development of Federal Rule of Evidence 804(*b*)(3).**    In 1969, the Advisory Committee to the Standing Committee on Rules of Practice and Procedure completed its first draft of the Federal Rules of Evidence.    Keller, 83 Colum. L. Rev. at 174.    The first draft departed markedly from the common-law rule adopted in *Donnelly* and instituted an exception for *some* statements against penal interest.    Duck, 85 J. Crim. L. & Criminology at 1086–87.    Nevertheless, the original draft refused to admit "statements against penal interest that inculpated the defendant, citing their inherent evidentiary unreliability."    *Id.* at 1087. The Supreme Court omitted the restriction against inculpatory statements against penal interest when it issued the official draft of the Federal Rules of Evidence.    *Id.*

The proposed rule drew strong opposition.    The United States Department of Justice attacked the proposed rule on the ground that it would allow too many unreliable exculpatory statements into evidence. Peter W. Tague, *Perils of the Rulemaking Process:    The Development, Application, and Unconstitutionality of Rule 804(*b*)(3)'s Penal Interest Exception*, 69 Geo. L.J. 851, 869–70 (1981) [hereinafter Tague].    In addition to the Justice Department, Senator John L. McClellan believed that the new rule could potentially undermine effective law enforcement. *Id.* at 873.

Proponents of the new approach, however, received a boost from the United States Supreme Court in the 1973 case of *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).    In this case, the Supreme Court ruled that it was a denial of due process to refuse to allow a defendant to use evidence of a confession made by

another on hearsay grounds. *Chambers*, 410 U.S. at 302, 93 S. Ct. at 1049, 35 L. Ed. 2d at 313. While *Chambers* did not involve a case where the declarant was unavailable, it did stand for the proposition that under at least some circumstances, out-of-court admissions or statements against penal interest could be so probative that it would be a denial of due process to refuse to allow their admission.

In the end, a compromise was reached between members of Congress who believed that admissions against penal interest should be treated similarly to admissions against pecuniary or proprietary interests and those who opposed broad admission of statements against penal interest. Tague, 69 Geo. L.J. at 873. The first sentence of the compromise rule generally allowed admission of a "statement" that at the time of its making was "so far contrary" to a declarant's interest, or that "so far tended" to subject a declarant to civil or criminal liability that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Congress, however, added another sentence to the rule not found in the original draft. Specifically, Congress added a sentence that provided that a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. *Id.* at 876. This second sentence created an apparent asymmetry between admission of hearsay statements against penal interest offered by the prosecution tending to inculpate the accused and hearsay statements against penal interest offered by the defense to exculpate the accused.[2]

---

[2]Some of the imbalance, however, has been corrected by *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), which prohibits

**D. Interpretation of Relevant Elements of Rule of Evidence 5.804(*b*)(3).** In determining whether a statement is admissible under rule 5.804(*b*)(3) several questions arise.

1. *Meaning of term "statement."* The first question under rule 5.804(*b*)(3) is the scope of the term "statement." There are several possible approaches. The term could broadly refer to an entire narrative. Conversely, the term narrowly could mean only individual factual assertions. Or, the term could mean individual factual assertions along with collateral material necessary to understand the context in which the factual assertions are made.

The United States Supreme Court confronted the meaning of the term "statement" in *Williamson v. United States,* 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994). Prior to *Williamson,* federal courts were divided on the question of the admissibility of collateral, noninculpatory statements contained in a confessional narrative. John P. Cronan, *Do Statements Against Interest Exist? A Critique of the Reliability of Federal Rule of Evidence 804(*b*)(3) and Proposed Reformation,* 33 Seton Hall L. Rev. 1, 8 (2002) [hereinafter Cronan]. In *Williamson,* Justice O'Connor wrote for the majority that each individual statement within a narrative must be evaluated to determine whether it was admissible under the rule. *Williamson,* 512 U.S. at 600–01, 114 S. Ct. at 2435, 129 L. Ed. 2d at 483. Justice O'Connor noted that "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Id.* at 599, 114 S. Ct. at 2435, 129 L. Ed. 2d at 482. On the other hand, she noted that

---

the prosecution from offering into evidence testimonial admissions against the accused under the Confrontation Clause. *Crawford,* 541 U.S. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203.

trustworthy statements against interest can be interspersed in a narrative with other statements that do not have the same level of credibility. *Id.* at 600–01, 114 S. Ct. at 2435, 129 L. Ed. 2d at 483–84.

Because of this inherent tension, we adopt the middle-ground approach. We hold that only inculpatory statements and the collateral material necessary to provide context to the statements are admissible under our rule of evidence. When presented with a writing or narrative testimony, the district court must sift through it and admit the wheat and discard the chaff as suggested by Justice O'Connor in *Williamson.*

2. *Threshold requirement of adversity.* The second question presented under the rule is whether the statement is sufficiently inculpatory as to amount to a statement against penal interest. Under our rule, a statement against penal interest must have "so far tended" to inculpate the accused "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Iowa R. Evid. 5.804(*b*)(3). This requirement is designed to establish a threshold level of trustworthiness of the underlying statement.

Although not expressly required, this adversity requirement implicitly demands that the person knew or at least believed that the statement was against penal interest at the time it was made. 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 496, at 813–14 (2d ed. 1994) [hereinafter Mueller & Kirkpatrick]; 5 Clifford S. Fishman, *Jones on Evidence, Civil and Criminal* § 36:67, at 584 (7th ed. 1992) [hereinafter Fishman]. Otherwise, the rationale of the exception, namely, that a reasonable declarant would not make a statement against interest unless true, would be undermined.

The threshold adversity requirement also poses a question of degree. Some cases indicate that a statement does not come within the rule unless the statement squarely and unequivocally implicates the declarant in criminal activity or is tantamount to a confession. *See, e.g., United States v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004). The rationale in these cases being that some statements are simply so vague or equivocal that they do not really amount to statements against interest.

Others cases suggest a lower standard. *See, e.g., United States v. Candoli*, 870 F.2d 496, 509 (9th Cir. 1989); *United States v. Toney*, 599 F.2d 787, 790 (6th Cir. 1979); *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978). These cases tend to emphasize the "so far tended" language in the rule which suggests that incriminating statements which amount to less than a full confession may be admissible. Most commentators also believe that statements that fall short of a confession are the kinds of statements that should be admitted under the rule. 4 Mueller & Kirkpatrick § 496, at 815–16; 5 Fishman § 36:87, at 646.

Given the broad and general language of the rule, especially the "so far tended" clause, we conclude that a statement need not amount to a full confession in order to be admissible as a statement against penal interest. *See United States v. Thomas*, 571 F.2d 285, 288–89 (5th Cir. 1978); *United States v. Barrett*, 539 F.2d 244, 251 (lst Cir. 1976).

There also is a question regarding the proper result when there are potentially conflicting motivations for making the incriminating statements. For example, a father may claim that he alone possessed drugs, a statement that, if believed, would exonerate his son. *United States v. Paulino*, 445 F.3d 211, 218 (2d Cir. 2006). While the statement itself is clearly against penal interest, the father also has a strong motive to lie to protect his son. Under these circumstances, some courts have

taken a relatively strict approach, excluding statements where there are possible explanations or motives that suggest the declarant may be lying. *See United States v. Pena*, 527 F.2d 1356, 1361 (5th Cir. 1976) (finding statements not sufficiently against interest where the declarant had mixed motives, including proper role as an informant, to make the incriminating statement). Other courts, however, have indicated that when there are conflicting motivations for making an incriminating statement, the issue is best resolved by the jury. *Cf. Candoli*, 870 F.2d at 509 (noting that conflicts in a statement against interest goes to the weight the jury should afford the evidence, not to its admissibility).

Like judges, commentators also seem divided on the issue. The Fishman treatise admits that there is no firm rule on how the issue should be resolved, but suggests that where a statement offered by a declarant as exculpatory evidence has some tendency to expose the declarant to criminal liability but also fulfills a self-serving purpose, the court must assess the probabilities. 5 Fishman § 36:66, at 583–84. Mueller and Kirkpatrick suggest that statements should be excluded when the motivation undermines its trustworthiness. 4 Mueller & Kirkpatrick § 496, at 819–20. The Weinstein treatise, however, appears to have more faith in juries, suggesting that determination of the declarant's credibility "should not be used as a means of usurping the jury's function." 5 Joseph M. McLaughlin et. al, *Weinstein's Federal Evidence* § 804.06[5][b], at 804–68 (2d ed. 2009).

We conclude that the use of the term "tended" in the rule suggests that it is not necessary that the statement be an explicit admission. We also conclude that the presence of conflicting motivations is ordinarily a question for the jury to consider. *State v. DeWitt*, 597 N.W.2d 809, 811

(Iowa 1999) (noting that the meaning and weight of an inculpatory statement is ordinarily for the jury to determine).

3. *Corroborating circumstances.* The third question presented under this rule is the scope of the corroboration requirement when the statement against interest is being offered to exculpate the accused. Like the parties who participated in the development of the rule, subsequent courts have struggled over the meaning of corroboration contained in the last sentence of rule 5.804(*b*)(3). The corroboration rule must require something more than the inherent trustworthiness associated with a declaration against interest. Otherwise, the additional sentence would be written out of the rule. But what exactly is required?

Some applications of the corroboration rule are easy. Over 200 persons confessed to killing the Lindbergh baby but had no connection whatsoever to the crime. Cronan, 33 Seton Hall L. Rev. at 21. While the confessions might have been unequivocal and obviously against penal interest, they were of no probative value due to the total lack of corroborating circumstances.

In closer cases, however, the issues assume much sharper relief. For instance, does the corroboration requirement affirmatively require the defendant to offer extrinsic evidence that tends to support the trustworthiness of the statement? What if there is no extrinsic evidence affecting the trustworthiness of the statement? Regardless of the answer to these questions, what degree of corroboration is required to "clearly indicate" the trustworthiness of the statement?

Some courts have suggested that corroboration requires the presence of extrinsic evidence that supports the inculpatory statements of the declarant. *See United States v. Forest*, 355 F.3d 942, 955 (6th Cir. 2004), *rev'd on other grounds by Garner v. United States*, 543 U.S. 1100,

125 S. Ct. 1050, 160 L. Ed. 2d 1001 (2005). Other courts have indicated that such independent evidence is irrelevant and that a court should only consider the circumstances under which the inculpatory statement was made. *See United States v. Barone*, 114 F.3d 1284, 1295–96 (lst Cir. 1997).

Given the broad, general language of the last sentence of the rule, however, the best approach to determining whether a statement is adequately corroborated appears to be a multifactored test in which all evidence bearing on the trustworthiness of the underlying statement may be considered. *United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995); *see* 4 Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* § 804.02[9], at 804–19 to –20 (9th ed. 2006) [hereinafter Saltzburg]. No one criterion would be determinative, but the district court could consider a wide variety of facts and circumstances in making the ultimate determination of admissibility.

For example, under the multifactor test, one consideration would be the relationship between the declarant and the defendant. In some cases, the relationship might be sufficient to exclude an admission against penal interest, for example, where a father already implicated in a drug transaction seeks to further inculpate himself and exculpate his son. *Paulino*, 445 F.3d at 219–20. On the other hand, where there are sufficient other circumstances that tend to corroborate an inculpatory statement, the mere fact that a father is exculpating a son may not bar admission. *United States v. Paguio*, 114 F.3d 928, 933 (9th Cir. 1997).

The information within the statement itself may also be considered as an element of corroboration. Is the statement so contradictory as to be not creditable? As Judge Posner has pointed out, however, a court must be careful not to usurp the role of a jury by making credibility

determinations that are outside the proper scope of the judicial role. *United States v. Amerson*, 185 F.3d 676, 692 (7th Cir. 1999) (Posner, C.J., dissenting).

Courts determining whether there are sufficient corroborating circumstances consider a number of factors in making the determination. The factors considered often include:

> (1) whether there is any apparent motive for the out-of-court declarant to misrepresent the matter, . . . (2) the general character of the speaker, . . . (3) whether other people heard the out-of-court statement, . . . (4) whether the statement was made spontaneously, . . . (5) the timing of the declaration[, and (6)] the relationship between the speaker and the witness.

*United States v. Alvarez*, 584 F.2d 694, 702 n.10 (5th Cir. 1978); *accord State v. Martinez*, 621 N.W.2d 689, 693–94 (Iowa Ct. App. 2000).

A second major issue under the corroboration requirement is the amount or level of corroboration required. What amount of evidence is sufficient to provide corroboration clearly indicating trustworthiness? While the term "clearly" is a relatively strong term, the word "indicating," particularly in the law of evidence, is comparatively weak. Considering the language alone, it seems reasonable to conclude that there may be facts or circumstances that clearly indicate trustworthiness, even though a reasonable jury might conclude otherwise. A number of cases seem to take this kind of approach. *See, e.g., United States v. Doyle*, 130 F.3d 523, 543–44 (2d Cir. 1997); *United States v. Garcia*, 986 F.2d 1135, 1140–41 (7th Cir. 1993).

As noted by one set of commentators, it makes no sense to set the corroboration standard so high that if a defendant can meet it, he would "probably never have been charged or tried in the first place." 4 Saltzburg § 804.02[9], at 804–21. On the other hand, the defendant's own claim of innocence cannot be sufficient corroboration. Otherwise,

the corroboration requirement would be read out of the statute. *Id.* In order to balance these competing interests, a leading treatise advanced the following standard:

> "The court should only ask for sufficient corroboration to 'clearly' permit a reasonable man to believe that the statement might have been made in good faith and that it could be true. If, for example, the proof is undisputed that the person confessing to a shooting could not have been at the scene of the crime because he was in prison, it will be excluded. But if there is evidence that he was near the scene and had some motive or background connecting him with the crime that should suffice."

*People v. Barrera*, 547 N.W.2d 280, 289 (Mich. 1996) (quoting 4 Weinstein & Berger, *Evidence* ¶ 804(b)(3)[03], at 804–154 to –55).

We do not adopt a hard and fast rule regarding corroboration. Instead, we conclude that each statement against interest must be evaluated in context. Clearly, specious assertions, such as "I killed the Lindbergh baby," by persons completely unconnected with the time and place of the abduction and murder, lack corroboration and should be excluded. On the other hand, if a declarant is tied to the time and place of the crime and the statement has substantial plausibility, the corroboration requirement has been met.

**E. Application of Principles to Current Case.** Applying these principles to this case, we conclude that Millard did make statements against interest under rule 5.804(*b*)(3). She stated that Paredes "did not do it," that he "would not hurt the baby," that she "does not want her boyfriend to take the fall" for the child's injuries, that Paredes "is not that kind of guy, not violent," and that he "did not take care of the baby that much." Considered in isolation, these statements merely exculpate Paredes, but they are plainly self-inculpatory when considered in context. Except for a brief fifteen-minute interval when the baby was cared for by Paredes' sister, Millard and Paredes were the infant's only

caregivers when the injuries were inflicted. As a result, by making statements tending to exculpate Paredes, Millard was indirectly implicating herself as the person who caused the injuries. These statements were not hypothetical when evaluated in the proper context.

In addition, Millard made statements that were directly inculpatory. She stated that the baby had been crying, that she yelled at him to "shut up," and that she had "started spanking him lately," which she claimed did not hurt him since he wore a diaper. Yelling "shut up" at a crying two-month-old shows obvious lack of self-control. Further, spanking a two-month-old child for crying, even with a diaper on, is an admission of inappropriate behavior that could give rise to an inference that Millard was the person who injured the child.[3]

Finally, Millard asked Gail what would happen to her if it was discovered that she did hurt the baby. Although she at no time directly admitted that she was responsible for the injuries, an inquiry about potential sanctions tends to suggest that she may have been responsible. While it is true, as the State asserts, that Millard couched her questions about potential sanctions in hypothetical terms, we conclude that the statements tended to shift responsibility away from Paredes and toward Millard.

We further note that Gail herself considered the statements significant. Twice during the conversation she admonished Millard that she needed to consult with her attorney. After the conversation, she prepared a contemporaneous memorandum and forwarded the

---

[3]The State at oral argument conceded that the statement about spanking a two-month-old would likely be a statement against interest, but suggested that the evidence would be merely cumulative. The State notes that at trial, Paredes' sister testified that Millard spanked the child. Paredes' sister, however, could have been motivated to shift blame for the child's injuries away from her brother. As a result, we do not find the evidence cumulative.

memorandum to her supervisors, who in turn provided it to local law enforcement authorities. It is clear that Gail and her supervisors recognized the potential criminal implications of the conversation. As a result, we conclude that the above statements amount to statements against interest under Iowa Rule of Evidence 5.804(*b*)(3).

We do not conclude, however, that Millard's failure to contradict Gail when the social worker "kept talking to her as if she did it" amounts to an admissible tacit admission. Whether and under what circumstances silence should be regarded as an admission has been subject to considerable debate. *See Commonwealth v. Dravecz,* 227 A.2d 904, 906–07 (Pa. 1967) (quoting various contradictory proverbs about silence such as "Silence gives consent" with "Silence is Golden" in rejecting rule of admission by silence); Maria L. Ontiveros, *Adoptive Admission and the Meaning of Silence: Continuing the Inquiry into Evidence Law and Issues of Race, Class, Gender, and Ethnicity*, 28 Sw. U. L. Rev. 337, 341–45 (1999) (discussing sociological differences of the meaning of silence); Peter Tiersma, *The Language of Silence*, 48 Rutgers L. Rev. 1, 8–9 (1995) (discussing the nuances of the "meanings" of silence, which can include consent, apathy, preoccupation, or fear).

There is federal authority for the proposition that a party may adopt a statement through silence under some circumstances and that such evidence may be admitted under the federal rules as an admission by a party-opponent. *See United States v. Robinson,* 275 F.3d 371, 383 (4th Cir. 2001); *Marshall v. Young,* 833 F.2d 709, 716 n.3 (7th Cir. 1987). Whether we should extend this reasoning to allow the introduction of tacit admissions under the statements against interest exception is a question best left for another day. While we have traditionally accepted admissions by silence or tacit admissions, we also stressed that because

silence is often more ambiguous than verbal expression, tacit admissions should be received with caution. *Friedman v. Forest City*, 239 Iowa 112, 133–34, 30 N.W.2d 752, 763 (1948). In this case, Gail apparently adopted the hypothetical framework constructed by Millard, but there was no evidence that Gail accused Millard of criminal conduct in a way that would require a response by a reasonable person. *See United States v. Moore*, 522 F.2d 1068, 1074–76 (9th Cir. 1975). As a result, the evidence of Millard's tacit admissions is not admissible under rule 5.804(*b*)(3).

Even though Millard's express statements are sufficiently inculpatory to qualify as admissions against interest under Iowa Rule of Evidence 5.804(*b*)(3), they are not admissible to exculpate Paredes unless corroborating circumstances indicate their trustworthiness. We have previously held that it is not necessary to demonstrate corroborating evidence of the statements themselves. Rather, as noted above, we conclude that the focus is on whether the circumstances under which the statements were made are sufficiently trustworthy to allow a jury to make the ultimate determination concerning their truth. *DeWitt*, 597 N.W.2d at 811.

We conclude that there are sufficient corroborating circumstances to allow admission of Millard's inculpatory statements.[4] First, Millard chose to make these statements to someone she trusted, a person who

---

[4]The State argues that some of the corroborating circumstances of trustworthiness offered by Paredes, including Jimenez's testimony, were not included in the offer of proof, but was evidence adduced at trial. The State claims that under applicable precedents, evidence adduced at trial but not contained in the offer of proof may not be considered. We disagree. The State's argument is premised on the need to offer sufficient indicia of reliability for Confrontation Clause purposes under the pre-*Crawford* test, rather than the corroboration requirement of rule 5.804(*b*)(3). *See Hallum*, 585 N.W.2d at 257. In any event, sufficient corroboration is found within the context of the Millard statements themselves to support admission.

was not directly involved in the case. On its face, it appears that Millard was seeking advice from Gail and not trying to manipulate the system. Second, Millard's statements to Gail find at least some support in the record—Millard was a caregiver to the infant at the relevant time, her statements are consistent with Paredes' recantation of his confession, and her statements are to some extent corroborated by the testimony of Paredes' sister.

There are, of course, potential problems with Millard's statements. In particular, it is possible that she was exploring a plan to manipulate the system by falsely exonerating her boyfriend while avoiding criminal sanctions because of her claimed mental incapacity or because of her status as a minor. The standard, however, is whether a statement *might* have been made in good faith and that it *could* be true. Under the record presented here, we conclude that a reasonable jury could find Millard's statements truthful. As such, the district court erred by refusing to admit her statements under Iowa Rule of Evidence 5.804(*b*)(3).

**F. Harmless Error.** The State contends that Paredes' conviction nonetheless should be affirmed because the exclusion of Millard's statements amounted to harmless error. Paredes responds that Millard's statements were a vital part of his defense.

Reversal of a ruling which admits or excludes evidence is not necessary unless a substantial right of a party is affected. Iowa R. Evid. 5.103(*a*). To determine whether a substantial right of a party has been affected when a nonconstitutional error occurs, we employ harmless error analysis and ask: " 'Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?' " *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004) (quoting *State v. Trudo,* 253 N.W.2d 101, 107 (Iowa

1977)). In considering harmless error, " '[W]e presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise.' " *Newell*, 710 N.W.2d at 19 (quoting *Sullivan*, 679 N.W.2d at 30).

After reviewing the record as a whole, we cannot find the error harmless. In this case, Paredes put forth a general denial defense. The only other plausible suspect was Millard. While Jimenez certainly pointed suspicion at Millard, she is the defendant's sister whose credibility is questionable both because she has a potential motive to exonerate her brother and because of the evolution of her statements to law enforcement.

Millard's statements to Gail would have clearly aided the defense in its only available theory, namely, that Millard was responsible for the child's injuries. This is especially true as the State's case rested primarily on Paredes' confession and access to the child. The introduction of Millard's statements would have additionally answered the jury's likely questions of where the mother was and why she did not testify in the case. *See Chia v. Cambra*, 360 F.3d 997, 1005–06 (9th Cir. 2004) (finding due process violation where statements against interest by another suspect were suppressed as the statements were the defendant's best and only evidence of innocence). On this record, the State has not affirmatively established that the exclusion of Millard's statements did not injuriously affect Paredes' substantial rights. Reversal of Paredes' conviction is, therefore, required.

## V. Conclusion.

We hold that the court of appeals erred when it affirmed Paredes' conviction on the ground that Paredes failed to show that Millard was unavailable to testify at trial. We further hold that Millard's statements

constitute statements against interest that were erroneously excluded from evidence in Paredes' trial. Under all the facts and circumstances, we conclude that the error was not harmless. As a result, the decision of the court of appeals is vacated, the judgment of the district court is reversed, and the matter is remanded to the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED**.

All justices concur except Cady, J., who dissents and Baker, J., who takes no part.

**CADY, Justice (dissenting).**

I respectfully dissent. The majority makes two holdings in reaching its decision that branch out too far from the trunk of the legal principle from which they are derived. I would affirm the decisions of the court of appeals and the district court.

## I. Role of the Court.

The majority correctly identifies that the standard of review for the admissibility of hearsay is for the correction of errors at law. *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006). Notwithstanding, it establishes a rule that gives the jury discretion to consider the admissibility of statements against interest made by a declarant with mixed motivations for making the statement. This approach is not only inconsistent with our reviewing standard, but it is also inconsistent with the important gatekeeping function of courts.

In performing the legal task of deciding the admissibility of hearsay evidence, a district court must decide certain preliminary questions by applying the law to existing evidence. Iowa R. Evid. 5.104(*a*). Once the courts decide the evidence is admissible, the jury determines its weight and credibility. Iowa R. Evid. 5.104(*e*).

Before a court can admit hearsay in the form of a statement against the interest of an unavailable declarant for the purposes of exculpating a defendant, several threshold requirements must be satisfied. One such threshold requirement is that the statement be sufficiently inculpatory to amount to a statement against penal interest. This important requirement is tied to the fundamental premise for admitting hearsay—cross-examination of the declarant is unnecessary to probe the truth of the statement because the statement itself is

inherently trustworthy. *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S. Ct. 1038, 1048–49, 35 L. Ed. 2d 297, 312 (1973) (stating that whether the confession is "in a very real sense self-incriminatory and unquestionably against interest" is a significant indicator of reliability).

In this case, the majority abandons trustworthiness as an essential predicate to the admissibility of hearsay. It holds that in cases, such as this case, in which the surrounding circumstances suggest mixed motives for a declarant to make a statement (which creates doubts about the trustworthiness of the statement), the jury, not the court, should decide if the statement is against the declarant's interest. The Mississippi Supreme Court has eloquently described its reasons for disallowing exculpatory declarations against interest when mixed motives are apparent: "Many motives, apart from the love of truth and justice, induce men to assume the gravest risks." *Brown v. State,* 55 So. 961, 962 (Miss. 1911). The new rule declared by the majority today transfers a historical judicial function to the jury and essentially gives the jury the discretion to consider hearsay evidence.

The gatekeeping function of the court should be intensified, not eliminated, when the trustworthiness of the hearsay at issue is in doubt. The new rule created by the majority is detached from the purpose of creating exceptions to the rule against hearsay and conflicts with the time-honored role of the court in the trial of a case. It gives juries power well beyond their traditional role and undercuts the importance of cross-examination in our system of justice.

## II. Preservation of Error.

The doctrine of preservation of error is built on the premise that trial courts must first decide legal questions, and appellate courts review the decisions made. The doctrine is also built on the principle of

fairness, which has given rise to the principle that neither party to a case may normally assert a claim or defense on appeal they could have, but failed to, raise at trial. *DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002).

In this case, there is nothing in the trial record to reveal Paredes raised the claim that the hearsay testimony of the social worker was admissible as a declaration against interest. If he had, he would have been required to establish the threshold requirements of the rule, including the unavailability of the declarant. Nevertheless, the preservation-of-error doctrine does not now preclude Paredes from claiming on appeal that the district court erred by failing to admit the evidence as a statement against interest because the district court used the statement-against-interest rule as a basis for ruling the evidence to be inadmissible. The district court made a preliminary finding that the declarant was unavailable, but found the other preliminary requirements were not satisfied.

On appeal, the State sought to uphold the ruling of the district court on the basis that the other predicate requirements of admissibility were not proven by Paredes. The State failed to argue on appeal that the evidence was inadmissible because the district court erred in finding that the declarant was unavailable. Nevertheless, the court of appeals upheld the decision of the district court, but on the basis that there was insufficient evidence to find that the declarant was unavailable.

As in district court, the court of appeals decided the contested issue on a ground not raised or contested by the parties. Yet, if this factor does not preclude Paredes from raising such a ground on appeal, it should not preclude the State from raising a ground relied on by the court of appeals on further review. In other words, just as the district court preserved error for Paredes, the court of appeals preserved error for

the State. This approach is only a matter of fairness and does not undermine or disadvantage Paredes in any way. He was, under the law, required from the inception to establish all of the requirements for the admissibility of the evidence as a statement against interest. The trial record is now available to review to determine if the evidence supports this requirement.

There is, of course, no question Paredes failed to establish the requirement of unavailability. Therefore, Paredes should not receive the benefit of a new trial (with the right to have the disputed evidence admitted) without ever proving all the essential legal requirements for admission.

The majority has failed to apply the preservation-of-error rule in the same manner for both parties. This is unfair and contrary to the dictates of *DeVoss*. *Id.* Our law should not have rules that do not apply the same to both parties.

### III. Conclusion.

I would affirm the decision of the court of appeals that Paredes failed to establish the declarant was unavailable.