# IN THE COURT OF APPEALS OF IOWA

No. 21-0916
Filed October 5, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**TODD W. ADAMS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Clinton County, Patrick A. McElyea,
Judge.

A defendant appeals his conviction for five counts of second-degree sexual
abuse and two counts of indecent contact with a child. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant
Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney
General, for appellee.

Heard by Bower, C.J., Tabor, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2022).

**TABOR, Judge.**

A jury found Todd Adams guilty of five counts of sexual abuse in the second degree and two counts of indecent contact with a child for offenses against three of his step-granddaughters. On appeal, he contends the district court abused its discretion in excluding evidence that the girls' mother had a motive to coach them to lie. He also challenges the admission of hearsay from a nurse who relayed statements made by two of the girls while being treated at a child protection center (CPC). Because Adams failed to preserve his first challenge, we do not reach the merits. On the hearsay claim, we find the nurse's testimony was admissible under the exception for statements made for the purpose of medical diagnosis or treatment. Thus, we affirm.

## I. Facts and Prior Proceedings

Adams and Carol Bower met in 2014. They married on Halloween in 2016, making Adams the step-father to Bower's daughter Billie and the step-grandfather to Billie's four young daughters: V.S., A.S, M.H, and E.H.[1] Billie's daughters enjoyed staying at their grandparents' house because it had toys, games, and farm animals; they would often spend nights and weekends there. But Billie had a fraught relationship with her mother. The pretrial record shows that Billie had a history of substance abuse and her mother took steps to have her involuntary committed.

Adding to the family's issues, both Bower and Billie knew Adams was a registered sex offender. He was convicted of second-degree sexual abuse in

---

[1] V.S. was born in 2009, A.S. in 2011, M.H. in 2013, and E.H. in 2014.

1994.  His victim was five years old.  Given Adams's history, from time to time, Billie asked the girls if anyone had touched them inappropriately.

The girls stopped going to their grandparents' house in August 2019 after E.H. told Billie that "Papa Todd" had repeatedly touched her "private parts."  After first denying any abuse, sisters V.S. and M.H. eventually told their mother that Adams had touched them too.  The girls alleged Adams began inappropriately touching them as early as October 2016 when he married their grandmother.[2]  The fourth girl, A.S., said she was not touched and did not see anything happen to her sisters.  Billie contacted the Iowa Department of Human Services (DHS),[3] which scheduled an appointment for the girls at the St. Luke's Hospital CPC.  According to Billie, she also told Bower about the girls' allegations, and Bower reacted by pursuing an involuntary commitment of Billie two days later.

In early October 2019, all four girls were interviewed at the CPC.  A.S., E.H., and M.H. said Adams did not touch them.  But V.S. said he did touch her.  A DHS worker attended the girls' interviews and contacted law enforcement.

Law enforcement scheduled another CPC visit for the older sisters, V.S. and A.S., in late October.  Their stories remained the same.  Law enforcement then scheduled the younger sisters, M.H. and E.H., for another CPC visit in mid-November.  During this second appearance, the younger sisters were examined by sexual assault nurse examiner Kristen Kasner.[4]  During their medical exams,

---

[2] All the girls were under twelve years old during this time frame.

[3] That department recently merged with the Iowa Department of Public Health.  But because it encompassed only human services throughout this investigation, we will continue to use the acronym DHS in this opinion.

[4] Their father accompanied them to the appointment.  But the record is unclear when he was in the exam room.

the girls told Kasner that Adams had touched them and described the contact between their body parts. The same day as those exams, Kasner shared the girls' revelations with the DHS and law enforcement.

In August 2020, the State charged Adams in a ten-count trial information: five counts of sexual abuse in the second degree (three against M.H. and two against E.H.); two counts of indecent contact with V.S.; and three counts of dissemination of obscene material to a minor.[5] Pretrial, the State moved to exclude any evidence of Billie's chronic drug use as irrelevant. The State also moved to exclude evidence of her past involuntary commitment, orchestrated by Bower, as confusing and potentially prejudicial. As a "preliminary matter" the court excluded that evidence, "not wanting to turn this into a trial about Billie." Also pretrial, Adams moved to exclude any hearsay statements the girls made to nurse Kasner during their exams; the State resisted. The district court reserved ruling on that hearsay objection until trial.

Once it came to trial, the younger girls were asked why they denied that Adams had touched them in their first CPC interviews. M.H. explained that she "was nervous to say and kind of scared." E.H. testified she only remembered one interview and if she did say Adams did not touch it was because she forgot.

Before nurse Kasner's testimony, the State made an offer of proof concerning the younger girls' statements during their medical examinations. The district court ruled the statements were admissible under the hearsay exception

---

[5] The original trial information also charged two counts of lascivious conduct with a minor. But the State dismissed those counts before trial. The district court granted judgment of acquittal on the obscenity charges.

for statements for the purpose of medical diagnosis or treatment. During her testimony, Kasner recalled that M.H. "referred to her mom maybe doing drugs." Based on that statement, Adams renewed his objection to the court's exclusion of Billie's history of substance abuse. The court reaffirmed its ruling excluding that evidence.

At the close of trial, the jury found Adams guilty of five counts of sexual abuse in the second degree and two counts of indecent contact with a child. Because Adams was a recidivist, the district court sentenced him to life in prison on the five sexual-abuse offenses and to four-year indeterminate sentences for each of the indecent-contact offenses. Adams now appeals.

## II. Analysis

### A. Drug-Use and Involuntary Commitment of the Girls' Mother

Adams first contends that the district court abused its discretion in granting the State's motion in limine excluding evidence of Billie's chronic drug use and her involuntary commitment facilitated by Bower. He claims this evidence was relevant to his defense that the girls fabricated their allegations and Billie's motive to encourage that fabrication. He contends the evidence would not have unduly complicated issues for the jury.

Preempting our consideration of this claim, the State argues Adams failed to preserve error by failing to renew his objection at trial and by failing to present an offer of proof to show Billie's past drug use and involuntary commitment. In response, Adams argues that the written limine ruling did not show further action was needed to preserve his objection to either the evidence of Billie's drug-use or the related issue of her involuntary commitment. He believes the pretrial ruling

reached the ultimate issue and was the final word. As for the offer of proof, he contends that the dispute over the timing of the involuntary commitment would only require asking Billie and Bower "a few questions" at trial.

But the court's pretrial ruling tells a different story:

> I think as a general matter I'm going to overrule your objection [to excluding evidence of chronic drug history]. I tend to agree with counsel that if there's a specific day that you're asking about and you have information that indicates there may have been drug use on that day that would impact, then I think we'll address that at the trial prior to asking any questions. But the fact that someone generally uses drugs to then use them—use that information to impeach them I think is a bridge a bit too far.
> . . . .
> I'm inclined to overrule the objection [to excluding evidence of the involuntary commitment] largely from the standpoint that I do think that this is at the very least under [Iowa Rule of Evidence 5.]403 looking at confusion of the issues and it may be potentially relevant testimony but I think it's going to turn the jury's focus to something else rather than whether or not the alleged actions between [Adams] and the victims happened. So I don't want to turn this into a trial about Billie by allowing any of this testimony.
> So at this point from a preliminary matter the Court's going to overrule the objection . . . .

The district court ruled that evidence of Billie's chronic drug use was prohibited, meaning Adams did not need to raise the issue again at trial. *See Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 90 (Iowa 2011) (stating that objections based on a limine ruling must be renewed unless the ruling "leaves no question that the challenged evidence will or will not be admitted at trial"). But the ruling on her involuntary commitment was explicitly "preliminary"—requiring an objection and offer of proof at trial. *See State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015) (finding claim not preserved where pretrial request to admit evidence was "preliminarily denied").

Sensing a sinking ship, Adams now tethers his involuntary-commitment claim to the substance-abuse history. He argues that by renewing his request to offer evidence of Billie's drug use when nurse Kasner "opened the door" during her testimony, he also revived the involuntary-commitment claim because those issues were so "tightly intertwined." But that trial objection did not cover both issues. Defense counsel argued only that Billie's drug use "created an unstable household," offering an alternate explanation for the stress on the children that had been attributed to Adams's alleged sexual abuse. The court made no further mention of the commitment, beyond reminding witnesses to not discuss it. Thus, Adams failed to preserve error on the exclusion of Billie's involuntary commitment.

Finally, assuming Adams did preserve his relevancy claim as to Billie's drug history, that is not the focus of his argument now. On appeal, he has abandoned any claim that her drug use, standing alone, was relevant. *See MidWestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 885 n.3 (Iowa 2020) (declining to reach issue abandoned by party on appeal). His appellate position is that "Billie's extensive drug use and resulting involuntary commitment" were relevant to his defense that the girls "fabricated their allegations at Billie's behest to punish her mother for having her committed." Because that evidentiary issue is not properly before us, we decline to reach the merits.

**B. Nurse's Hearsay Statements from E.H. and M.H.**

Adams next claims the district court erred in allowing nurse Kasner to testify over his hearsay objection. He argues the hearsay exception for statements made for medical diagnosis or treatment in Iowa Rule of Evidence 5.803(4) did not apply to Kasner's testimony. The State defends the district court ruling.

As opposed to most evidentiary issues, we review hearsay rulings for errors at law. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). That's because "a district court 'has no discretion to admit hearsay.'" *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020) (quoting *State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003)). We presume improper admission of hearsay evidence is prejudicial unless the record shows otherwise. *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017). But we still defer to the district court's factual findings when they are supported by substantial evidence. *Id.*

Before allowing Kasner to share the girls' out-of-court statements with the jurors, the court received information about her background and process. Kasner is a licensed nurse and certified sexual assault nurse examiner for children. She works at St. Luke's Hospital and met M.H and E.H. (along with their father) there in November 2019. As nurses do as part of a medical examination, Kasner checked the girls' height, weight, and blood pressure. She also explained to them the purpose of their appointment. She then asked each girl an open-ended question about why they were there, and gave them a "head-to-toe" examination.

With that background, the court allowed Kasner to testify about the information she gathered from M.H and E.H. Kasner told the jury that she asked the girls about their "family history" and "social history" such as who lived at their house and where they went to school. Kasner also explored the girls' behavioral and medical history and did a "review of the systems"—asking the girls if they were eating, sleeping, and breathing properly. Both children complained of constipation and M.H. had a stuffy nose and cough but neither had other injuries. Kasner outlined her physical findings to the court.

Most important for this appeal, Kasner recounted that after she asked M.H and E.H. why there were at the CPC, they revealed that Adams had touched "private" areas of their bodies. Kasner explained that it was "standard medical practice to say, what can I do for you today?" When Kasner asked E.H. why she was there, the child identified Adams as her abuser. The child told the nurse that Adams "touched her [with his fingers] right here" while motioning to the area between her legs. When Kasner posed the same routine question to M.H., the girl said she was there because her "mom [was] maybe doing drugs and people [were] doing bad things to me." M.H. clarified that the "bad things" were Adams touching her inappropriately. M.H. told Kasner that Adams touched her with "his hand and his tail." M.H. told the nurse that Adams "put his tail in her bottom" and that it hurt to "poop" or "pee" afterward.

Adams objected to Kasner's testimony on hearsay grounds, asserting the medical exception did not apply. The defense argued that the CPC "masquerade[s] as a health care entity when in truth they're acting as an extension of law enforcement." The court overruled the objection finding the evidence fell within the exception for statements made for the purpose of medical diagnosis or treatment. *See* Iowa R. Evid. 5.803(4).

Under this exception, a statement is admissible if it is "made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . [d]escribes medical history, past or present symptoms or sensations, or the inception or general cause of symptoms or sensations." Iowa R. Evid. 5.803(4)(A)–(B). Typically, such statements are "likely to be reliable because the patient has a selfish motive to be truthful" given that "the effectiveness of the medical treatment

rests on the accuracy of the information imparted to the doctor." *State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016) (citations omitted).[6]

To apply the exception, the hearsay proponent must show two factors. First, "the declarant's motive in making the statement must be consistent with the purposes of promoting treatment." *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (quoting *State v. Tracy*, 482 N.W.2d 675, 681 (Iowa 1992)). "[S]econd, the content of the statement[s] must be such as is reasonably relied upon in treatment or diagnosis." *Id.* (citation omitted). There is no categorical rule allowing or barring all testimony from nurses or doctors concerning statements made by children in a CPC context. *State v. Walker*, 935 N.W.2d 874, 879 (Iowa 2019).

Adams contends the State failed to meet either factor. As for motive, Adams argues the State offered no evidence that "the girls were advised or understood that they needed to tell the truth to nurse Kasner to ensure they received appropriate medical care." As for reliance, Adams contends that Kasner's true purpose in extracting the girls' statements, especially on the identity of the abuser, was to assist law enforcement.

Going in reverse order, we find the second factor easily satisfied. In her offer of proof, Kasner assured the court that collecting information about what happened to the girls was part of the "medical model" that guided her decision

---

[6] That selfish motive to be truthful may require a closer look when it comes to children—as they may not appreciate how important it is for them to tell the truth to medical professionals. *See Olesen v. Class*, 164 F.3d 1096, 1098 (8th Cir. 1999) (holding child's statements to physician were inadmissible if prosecution could not show child understood medical significance of being truthful); *but see State v. Vaught*, 682 N.W.2d 284, 289 (Neb. 2004) (declining "to presume that children speaking to physicians are not truthful and are not motivated by promoting medical treatment").

making. It informed "what to look for in the exam, what to do, how to treat the person. That applies to sex abuse as well as ear aches." When asked about identifying the perpetrator of the alleged abuse, Kasner agreed that it helped determine further treatment and how to keep the child physically safe. On this record, the district court had substantial evidence to find the girls' statements were the kind of information reasonably relied upon by medical professionals in deciding the patient's appropriate diagnosis and treatment.

Circling back to the first factor, we examine whether the girls made their statements with the aim to receive medical treatment or, instead, to further the criminal investigation. In finding the State satisfied this factor, the district court emphasized several points. First, the nurse asked an open-ended question. Second, the children disclosed not only the sexual abuse, but symptoms of other illnesses. For example, M.H. told Kasner that she had a stuffy nose, E.H. had constipation issues that the nurse wanted to address.

Yet Adams contends this was not enough to show their motives were consistent with the purpose of promoting treatment because the State failed to prove that the girls understood they needed to tell Kasner the truth. He points us to *Tracy*, which explained that the first factor is met when the healthcare provider "emphasized to the alleged victim the importance of truthful responses in providing treatment *and* the record further indicates that the child's motive in making the statements was consistent with a normal patient/doctor dialogue." 482 N.W.2d at 681 (emphasis added).

The State acknowledges that "explicitly telling the girls they needed to tell the truth can be helpful" but cites *Walker* to illustrate that such instruction from the

care provider is not mandatory. 935 N.W.2d at 880. Like the doctor in *Walker*, nurse Kasner followed a medical model of inquiry, explaining the purpose of the appointment, asking non-leading questions, and reviewing any symptoms that they presented. Given the similarities between these two sets of facts, we agree that *Walker* provides the best guidance for our analysis.

The State distinguishes the girls' statements to nurse Kasner from the CPC forensic interview at issue in *State v. Skahill*. 966 N.W.2d 1, 10 (Iowa 2021). *Skahill* held that a child-declarant's statements to a forensic interviewer did not fall within the medical-diagnosis exception. *Id.* But the *Skahill* court contrasted the inadmissible forensic interview with the CPC medical examination done before the interview, describing the child's statements to that doctor as "the type of information the medical diagnosis exception is designed to allow into evidence." *Id.* at 9. The *Skahill* court also contrasted the inadmissible forensic interview with the admissible statements in *Walker*, noting the interviewer "wasn't a physician, a psychologist, or therapist; there was a separate physician who attended to [the child] at that time; and [the interviewer's] questioning was self-described as 'forensic.'" *Id.* at 10.

Based on *Walker* and *Skahill*, we find the girls' motives in sharing their allegations about Adams with nurse Kasner were consistent with the purposes of promoting treatment and fall within the hearsay exception. Because both factors are met, the district court did not err in admitting nurse Kasner's testimony.

**AFFIRMED.**