# IN THE COURT OF APPEALS OF IOWA

No. 14-1780
Filed June 15, 2016

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**MARQUICE VERRON MORRIS,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

Defendant appeals his convictions for murder in the first degree and robbery in the first degree. **AFFIRMED.**

Molly E. Alley of Oliver Gravett Law Firm, P.C., Windsor Heights, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Benjamin M. Parrott, Assistant Attorneys General, for appellee.

Heard by Tabor, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

Christopher Byers was shot and killed in his living room while selling drugs to Marquice Morris and Joshua McCoy. Two other men were present at the time of the homicide: Tanner Harvey and Bobby Page, Byers' friends. Who killed Byers and why? According to Page, Morris and McCoy pulled out handguns during the transaction for the purpose of robbing Byers; either Morris or McCoy fired a shot into the floor and the other shot Byers in the chest; and Morris and McCoy fled the scene. Morris testified Byers, Harvey, and Page tried to rob Morris and McCoy during the transaction; Byers pulled a knife from a bag and Harvey pulled a gun; Morris pushed an advancing Harvey; and Harvey's gun discharged, killing Byers. It is not disputed all the men left the scene immediately after the shooting: Morris and McCoy exited the front door followed by Page several moments later; Harvey apparently jumped parkour-style out of a second-story window in the back of the house. Following an investigation, Morris and McCoy were arrested and charged with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2 (2013), and robbery in the first degree, in violation of Iowa Code sections 711.1 and 711.2. They were tried separately and each convicted as charged. Morris challenges his convictions and sentences.

I.

Morris contends there was insufficient evidence supporting the robbery conviction. Specifically, Morris contends there was insufficient evidence he, or someone he aided and abetted, had the specific intent to commit a theft, an

element of the offense. *See State v. Copenhaver*, 844 N.W.2d 442, 447–48 (Iowa 2014) (setting forth elements of the offense).

"In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). A jury verdict finding the defendant guilty will not be disturbed if there is substantial evidence to support it. *See State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). "Evidence that raises only suspicion, speculation, or conjecture is not substantial evidence." *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997) (internal quotation marks and citations omitted).

The State argues Morris failed to preserve error on the issue. "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). Here, Morris's counsel made only a generalized motion for directed verdict:

> Your Honor, at this time we would make a motion for directed verdict of not guilty. Your Honor, we believe the State has the obligation to bring forth evidence on each and every element of the crime charged—of the crimes charged to present a jury question. And that as we are aware, the court looks at that in the light most

favorable to the State. Nonetheless, we would move for a directed verdict of not guilty at this time.

A generalized motion for directed verdict that does not specify the count or counts and the specific element or elements challenged fails to preserve error for appellate review. *See State v. Ross*, 845 N.W.2d 692, 700 (Iowa 2014) ("Trial counsel is required to make a specific objection in his or her motion for judgment of acquittal in order to preserve error."); *Truesdell*, 679 N.W.2d at 615; *State v. Crone*, 545 N.W.2d 267, 270 (Iowa 1996) (holding error not preserved where the specific elements challenged were not identified in motion); *State v. Pitts*, No. 03-1888, 2005 WL 67573, at *1 (Iowa Ct. App. Jan. 13, 2005) (holding motion for judgment of acquittal challenging "each and every element" failed to specify grounds for acquittal and failed to preserve error for appellate review); *State v. Domenig*, No. 01-0899, 2003 WL 118218, at *7 (Iowa Ct. App. Jan. 15, 2003) ("Error is not preserved when a motion for judgment of acquittal does not point out the specific deficiencies in the evidence."). "To the extent error is not preserved on an issue, any objections must be raised within an ineffective-assistance-of-counsel framework." *State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015). Appellate counsel does not assert a claim of ineffective assistance of counsel. We thus affirm on this issue.

Even if error had been preserved, we find sufficient evidence in support of the conviction. On the morning of June 26, 2013, Dakata Diggins, who was dating Morris at the time, picked Morris up from the Fort Des Moines correctional facility purportedly to look for employment. One of Morris's roommates at the correctional facility testified at trial. The roommate testified Morris stated he "was

going to hit a lick or make a come up," which means to make money quickly, usually through illegal activity. As Diggins was driving her van, Morris saw Byers walking along the street and instructed Diggins to pull over. Morris and Byers spoke, and Byers provided Morris with Byers' telephone number. During that conversation and subsequent telephone conversations, Morris arranged to buy marijuana from Byers.

Later in the morning, Diggins and Morris went to Joshua McCoy's house. While at McCoy's house, Morris used Diggins' phone to call Byers. Morris, McCoy, and Diggins then left McCoy's house to go to Nikki Taylor's residence. From there, Diggins drove Morris and McCoy to an apartment complex. At the apartment complex, Morris and McCoy spoke to Byers, who was in the parking lot in a red Jeep with another man. After speaking with Byers, Morris and McCoy returned to Diggins' vehicle and instructed her to follow the red Jeep.

Diggins followed the red Jeep to Byers' house and parked her vehicle in front of Byers' neighbor's house. McCoy and Morris exited Diggins' vehicle and went into the house while Diggins stayed in her van. The timing is unclear, but less than twenty minutes later, Diggins heard something that sounded like fireworks. Immediately after, McCoy and Morris rushed back to Diggins' van and instructed Diggins "to go" and to drive fast. Morris told Diggins to drop them off at McCoy's house, which she did. Morris told Diggins to go to Taylor's house and wait.

Bobby Page testified at trial. His testimony filled in the blanks regarding what occurred inside Byers' home. Page testified he was good friends with

Byers. On the day in question, Byers went to Page's house and asked for a ride somewhere. Page agreed. As they went outside to get into Page's truck, Harvey pulled up in his red Jeep. Page and Harvey had been planning to go fishing later that day. Page told Harvey to follow them to Byers' house. However, Byers went with Harvey in the red Jeep and Page left to gather his fishing gear with the understanding they would meet at Byers' house.

When Page arrived at Byers' house, Byers and Harvey were not yet there. According to Page, when Harvey and Byers returned, they were being followed by a van with a woman and two men, now known to be Morris and McCoy, inside. Page went into the house, followed by Harvey and Byers with McCoy and Morris behind them. Harvey went into the kitchen to light a cigarette, leaving Page on the couch with Byers. Page testified he was looking down at his phone and when he looked up he saw Byers had pulled a bag of marijuana out of a backpack. He also saw Morris and McCoy had drawn guns. According to Page, one said, "[W]hat now?" Then either McCoy or Morris shot at the ground, and the other shot Byers in the chest. One held a semi-automatic firearm and the other a revolver. Before leaving, either McCoy or Morris asked for Page's and Harvey's car keys. Page never handed over his keys; instead, Page pointed to some keys on the table. After McCoy and Morris left, according to Page, he and Harvey also left the house to give chase. After an unsuccessful pursuit, Page and Harvey went to Page's house. They talked to some of Page's family members, decided to delete their phone calls, and then called 911. When they returned to Byers' home, Byers was dead.

Other evidence supported the jury's determination of guilt. After Diggins had waited at Taylor's residence for approximately thirty minutes, McCoy and Morris arrived. Diggins overheard Morris and McCoy speak about cutting off McCoy's dreadlocked hair. Diggins overheard McCoy say he shot in the direction of where the guy was standing. She also overheard Morris say he shot at the floor at Byers' house. Morris instructed Diggins to change her telephone number. Around 5:00 p.m., Diggins left Taylor's residence to return Morris to the Fort Des Moines correctional facility. After dropping Morris off, Diggins returned to Taylor's residence. Morris returned to Taylor's residence later in the evening after borrowing a bicycle from someone at the correctional facility. Diggins overheard Morris and McCoy discussing "the weed," and she saw each with marijuana in their possession. Morris returned to the correctional facility later that night.

Following an investigation, in which Page identified Morris and McCoy in a photo array, police arrested Morris at the correctional facility the night of the shooting. Morris told the detectives he had been having sex with his girlfriend all day and denied being with McCoy. "A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt and the false story is relevant to show that the defendant fabricated evidence to aid his defense." State v. Cox, 500 N.W.2d 23, 25 (Iowa 1993). Although he was at the correctional facility, Morris possessed $210 in cash at the time of his arrest.

McCoy was also arrested on the night of the shooting. The police found him hiding in a closet at Taylor's residence. He had just shaved his head.

McCoy called Taylor from the jail after his arrest while the police were still searching Taylor's residence. McCoy told Taylor he had hidden a gun under her couch cushions where he had been lying down. The police obtained a search warrant and discovered a Taurus 9mm handgun underneath the couch cushions.

A criminalist testified the 9mm could have fired the fatal bullet. A bullet was also found in the floor joist of the Byers' living room, corroborating Page's testimony that either Morris or McCoy fired a shot into the ground and the other shot Byers. The bullet in the floor joist was likely fired from a .357 caliber gun. It could not have been fired from the 9mm Taurus discovered under the couch cushions at Taylor's residence. The police did not recover a second weapon.

The primary basis of Morris's attack against the sufficiency of the evidence is the jury should have believed his version of events. Morris's testimony was significantly different from Page's testimony. Morris stated Byers pulled marijuana out of a backpack and handed it to him. Morris said he smelled the marijuana and then asked Byers where the rest was. Byers grabbed his backpack like he was going to pull out more marijuana; instead he pulled a knife. Morris said he dropped the marijuana and started to back up. Byers proceeded to get up from the couch and said to Morris, "[G]ive me the F-ing money, give me the F-ing money." According to Morris, Harvey entered the living room from the kitchen with a firearm and told Morris to get down. As Harvey approached Morris, Morris reached out and grabbed the gun to push it away. The firearm discharged, and it discharged through the ground. Morris testified he ran out of the house, jumped into the car, and told Diggins to "go, go, go, go." At trial, a

jailhouse informant testified Morris told him that he planned to falsely plead self-defense, claiming Byers had a knife, even though Morris was robbing Byers at the time of the murder.

When all of the evidence is viewed in the light most favorable to the verdict, there is substantial evidence Morris acted with the specific intent to commit a theft. It was within the province of the jury to determine whether Morris was credible. *See State v. Mitchell*, 568 N.W.2d 493, 503 (Iowa 1997). We see no reason to disturb the jury's verdict.

## II.

Morris contends the district court erred in excluding as hearsay certain deposition testimony of Tanner Harvey. Morris argues the deposition testimony corroborates Morris's account that Byers, Page, and Harvey intended to rob Morris and McCoy. Morris contends the statements should have been admitted pursuant to Iowa Rule of Evidence 5.804(b)(3) as a statement against interest or pursuant to Rule 5.807 under the residual exception.

To provide context, Morris and McCoy were charged as co-defendants and scheduled to go to trial together. The State identified Harvey as a witness. Morris and McCoy noticed the deposition of Harvey to occur in February 2014, but Harvey refused to participate in the deposition. At the time he was scheduled to be deposed, Harvey was incarcerated on unrelated charges. McCoy and Morris moved to exclude Harvey as a witness due to his refusal to participate in the deposition. The district court scheduled a hearing on the motion to exclude. Harvey testified at the hearing, and he informed the court that he would refuse to

be deposed and he would refuse to testify at trial. The district court then granted the joint motion to exclude Harvey as a witness.

Subsequent to the court's ruling, the co-defendants' trials were severed. McCoy was tried in April 2014 and convicted of murder in the first degree and robbery in the first degree. Harvey did not testify at McCoy's trial.

In May 2014, Morris filed a motion in limine wherein he withdrew his motion to exclude Harvey. At the hearing on the motion, Morris also argued he should be allowed to introduce into evidence Harvey's taped interview with the police following Byers' death and Harvey's testimony from the April hearing on the motion to exclude. The district court concluded the statements were hearsay and denied the request.

Later in May, the State filed a motion for rule to show cause why Harvey should not be held in contempt for refusing to be deposed and testify. The district court held a hearing on the State's motion. The State had already granted Harvey immunity, but Harvey nonetheless repeated his prior refusal to be deposed or testify. The district court found Harvey in contempt of court and sentenced him to six months' incarceration to be served consecutive to any other sentence Harvey was serving.

Morris's trial commenced on June 2, 2014. Harvey changed his position and informed the parties that he was willing to testify in Morris's trial. After the jury was impaneled and sworn, the district court recessed to allow the parties the opportunity to depose Harvey. The deposition was very brief. As relevant here, Harvey testified during his deposition that he, Byers, and Page intended to rob

Morris and McCoy, "Right off the bat that just sounded like, you know, an easy score for us. These two dudes [Morris and McCoy] that we don't know want to buy some weed from us. Instantly we just, you know, had the idea that we were just going to rob them." Harvey's counsel intervened on the ground that Harvey's testimony raised potential federal criminal liability and advised Harvey to re-invoke his Fifth Amendment right against self-incrimination. Harvey did re-invoke his right, and the deposition ceased. The parties informed the district court of what occurred. The district court granted the Morris's motion for mistrial.

In August of 2014, Morris filed a motion in limine. As relevant here, Morris requested the court allow into evidence Harvey's June deposition testimony as a statement against interest pursuant to Rule 5.804(b)(3) or pursuant to the residual exception set forth in Rule 5.807. The district court denied the request. "A district court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion." *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). However, we review the admissibility of hearsay evidence for correction of errors at law. *See id.* "This standard of review extends to determining whether statements come within an exception to the general prohibition on hearsay evidence, including the exception for statements against interest." *Id.*

Rule 5.804(b)(3) defines a statement against interest as follows:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is

not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The contours of the rule were set forth in *Paredes*. First, "only inculpatory statements and the collateral material necessary to provide context to the statements are admissible under our rule of evidence. When presented with a writing or narrative testimony, the district court must sift through it and admit the wheat and discard the chaff." 775 N.W.2d at 565. Once the scope of the relevant statement is determined, the district court must make a threshold determination:

> The second question presented under the rule is whether the statement is sufficiently inculpatory as to amount to a statement against penal interest. Under our rule, a statement against penal interest must have "so far tended" to inculpate the accused "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Iowa R. Evid. 5.804(b)(3). This requirement is designed to establish a threshold level of trustworthiness of the underlying statement.

*Paredes*, 775 N.W.2d at 565. "The third question presented under this rule is the scope of the corroboration requirement when the statement against interest is being offered to exculpate the accused." *Id.* at 566. "[T]he best approach to determining whether a statement is adequately corroborated appears to be a multifactored test in which all evidence bearing on the trustworthiness of the underlying statement may be considered." *Id.* at 567. "The factors considered often include: (1) whether there is any apparent motive for the out-of-court declarant to misrepresent the matter, . . . (2) the general character of the speaker, . . . (3) whether other people heard the out-of-court statement, . . . (4) whether the statement was made spontaneously, . . . (5) the timing of the

declaration[, and (6)] the relationship between the speaker and the witness." *Id.* at 567–68 (internal quotation marks and citations omitted). "[T]he defendant's own claim of innocence cannot be sufficient collaboration." *Id.* at 568.

We conclude the district court did not err in concluding the statement was not admissible as a statement against interest. The district court specifically found Harvey did not think the statement was inculpatory at the time it was made because Harvey had been granted immunity for his testimony. *See, e.g.*, *United States v. Gonzalez*, 559 F.2d 1271, 1273 (5th Cir. 1977) (holding statement was not admissible where witness had been given immunity and statement could not subject him to liability); *Shakespeare v. State*, 827 P.2d 454, 457 (Alaska Ct. App. 1992) ("Thus we have held that where the declarant is aware that he is not subject to prosecution for crimes revealed in a statement, the statement lacks trustworthiness and should not be construed as one against penal interest."); *State v. Hoak*, 692 P.2d 1174, 1180 (Idaho 1984) (holding statement made under promise of immunity was not sufficiently reliable to come within the statement-against-interest exception); *State v. Anthony*, 448 A2d 744, 754–55 (R.I. 1982) (holding statement was not admissible as statement against penal interest where the statement was made under the shroud of immunity). Counsel's after-the-fact recognition of the potentially inculpatory nature of the statement is insufficient to bring the statement within the exception to the hearsay rule. *See Paredes*, 775 N.W.2d at 565 ("Although not expressly required, this adversity requirement implicitly demands that the person knew or at least believed that the statement was against penal interest at the time it was made. Otherwise, the rationale of

the exception, namely, that a reasonable declarant would not make a statement against interest unless true, would be undermined."). The district court's finding is supported by substantial evidence and is binding on appeal. *See State v. Long*, 628 N.W.2d 440, 445 (Iowa 2001) ("If a court's factual findings with respect to application of the hearsay rule are not 'clearly erroneous' or without substantial evidence to support them, they are binding on appeal.").

We also conclude the district court did not err in ruling the statement was not admissible pursuant to the residual exception. Iowa Rule of Evidence 5.807 provides:

> A statement not specifically covered by any of the exceptions in rules 5.803 or 5.804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant."

There are five requirements for evidence to be admissible under the residual exception. *See State v. Rojas*, 524 N.W.2d 659, 662–63 (Iowa 1994). The five requirements are: "trustworthiness, materiality, necessity, service of the interests of justice, and notice." *Id.* The district court should make an explicit finding on the record for each requirement. *See State v. Brown*, 341 N.W.2d 10,

14 (Iowa 1983). The residual exception is to be used "very rarely[] and only in exceptional circumstances." *Id.*

Here, the district court found that the deposition testimony lacked trustworthiness. The district court was familiar with Harvey due to his conduct related to this case. Specifically, Harvey refused to participate in depositions in February 2014. He testified during the hearing on the motion to exclude in April. Harvey was before the court on the contempt charges immediately prior to the June trial date. It was clear to the district court, and we defer to the district court's credibility determination, Harvey went out of his way to interfere with the prosecution without regard to the outcome. He felt the police and the State were "disrespecting" him and "wasting his time." He testified he had issues with the police, including an allegation they destroyed his vehicle and erased information from his cell phone. Harvey was also an admitted liar with little credibility. Harvey admitted he lied to the police on the day of the shooting and told the police what he thought they wanted to hear. The State contends that Harvey was also motivated to fabricate information to exculpate Morris because Harvey might have been incarcerated with Morris if Morris were convicted. We need not address this latter speculative point. The district court's credibility finding, without consideration of the last point, is supported by substantial evidence, and it is binding on appeal. *See Long*, 628 N.W.2d at 445.

III.

Morris argues his sentences are illegal because the jury was not required to find there was an act constituting the assault element of the robbery charge

distinct from the shooting. The State contends this is a backdoor challenge to the jury instruction and not an illegal sentencing issue. The State argues Morris failed to preserve error by challenging the jury instructions. We agree this is a challenge to the jury instruction, and we agree the defendant failed to preserve error. *See State v. Hepperle*, 530 N.W.2d 735, 740 (Iowa 1995) ("Failure to properly object to an instruction not only waives the right to assert error on appeal, but also allows the instruction, right or wrong, to become the law of the case.").

Even if the issue were before us, the argument is without merit. The State charged Morris with murder in the first degree under two alternatives: (1) premeditated murder; and (2) felony murder. The marshaling instruction on murder provided:

> The State must prove all of the following elements of Murder in the First Degree as charged in Count I:
> 1. On or about the 26th day of June, 2013, the defendant, or someone he aided and abetted, shot Christopher Byers.
> 2. Christopher Byers died as a result of being shot.
> 3. The defendant, or someone he aided and abetted, acted with malice aforethought.
> 4.    (a) The defendant, or someone he aided or abetted, acted willfully, deliberately, premeditatedly and with a specific intent to kill Christopher Byers and/or
>    (b) The defendant, or someone he aided and abetted, was participating in the offense of Robbery in the First Degree.

The marshaling instruction provided to the jury for the robbery charge was as follows:

> The State must prove all of the following elements of Robbery in the First Degree as charged in Count II:

1. On or about the 26th day of June, 2013, the defendant, or someone he aided and abetted, had the specific intent to commit a theft.
2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, the defendant, or someone he aided and abetted:
   a. Committed an assault on Christopher Byers; and/or
   b. Threatened Christopher Byers with, or purposely put Christopher Byers in fear of immediate serious injury.
3. The defendant, or someone he aided and abetted:
   a. Purposely inflicted or attempted to inflict a serious injury on Christopher Byers; And/or
   b. Was armed with a dangerous weapon.

Relying on *State v. Heemstra*, 721 N.W.2d 549, 557–58 (Iowa 2006); *State v. Millbrook*, 788 N.W.2d 647, 650 (Iowa 2010); and *State v. Tribble*, 790 N.W.2d 121, 128–29 (Iowa 2010), Morris argues the convictions should merge because the jury did not make a finding that the assault element of the robbery was independent of the shooting. Our court recently decided the same issue, and we quote at length from our prior opinion:

> In *Heemstra*, our supreme court held the felonious assault of willful injury could serve as the predicate offense for felony murder only in certain circumstances, for instance, "if the defendant assaulted the victim twice, first without killing him and second with fatal results." *Heemstra*, 721 N.W.2d at 556. In *Millbrook*, the court considered a felony murder conviction predicated on the defendant's participation in the felonious assault of intimidation with a dangerous weapon, concluding "the fact that intimidation with a dangerous weapon is not a lesser-included offense of first-degree murder does not preclude application of the merger doctrine enunciated in *Heemstra*." *Millbrook*, 788 N.W.2d at 652. The *Millbrook* court ultimately upheld the murder conviction, finding the defendant committed an assaultive act sufficiently independent of the firing of the gun that resulted in the victim's death. *Id.* at 653–54. In *Tribble*, the court again considered a felony murder conviction based on the felonious assault of willful injury, and upheld the conviction because substantial evidence supported a jury finding that head trauma and asphyxia were caused by separate acts, either of which could have been the factual cause of the victim's

> death. *Tribble*, 790 N.W.2d at 129. Notably, *Heemstra*, *Millbrook*, and *Tribble* all address murder cases predicated on the forcible felony of felonious assault.
>
> None of the cases relied upon by Pollard discusses the possibility of merger when robbery serves as the predicate felony for felony murder. In fact, the *Heemstra* court twice quoted authorities which identified robbery as an independent felony, not subject to merger. *See Heemstra*, 721 N.W.2d at 556, 558 (citing *Commw. v. Quigley*, 462 N.E.2d 92, 95 (Mass. 1984) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 71, at 559 (1972) ("although rape, arson, robbery and burglary are sufficiently independent of the homicide, . . . aggravated battery toward the deceased will not do for felony murder") and citing *People v. Moran*, 158 N.E. 35, 36 (N.Y. 1927) ("The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape.")). *Millbrook* likewise quoted the *Moran* case from the New York Court of Appeals. *Millbrook*, 788 N.W.2d at 651.

*State v. Pollard*, No. 13-1255, 2015 WL 405835, at *3–4 (Iowa Ct. App. Jan. 28, 2015). We see no reason to deviate from our prior conclusion in *Pollard*.

In addition, there is substantial evidence in this case that the act supporting the predicate felony is independent of the act resulting in death. *See Tribble* at 128 ("The first act must relate to an element of the predicate felony, while the second independent act must kill another person."). Here, Morris drew a firearm during the robbery. That act was sufficient to establish robbery in the first degree independent of any act resulting in death. *See* Iowa Code § 711.2. Morris and McCoy also demanded the car keys from Page and Harvey while brandishing guns. That act was also sufficient to establish the predicate felony independent of the act resulting in Byers' death. We reject Morris's claim for this additional reason.

IV.

For the foregoing reasons, we affirm the defendant's convictions and sentences.

**AFFIRMED.**