# IN THE COURT OF APPEALS OF IOWA

No. 24-0905
Filed August 20, 2025

**JOHNNIE LEE BOUTCHEE,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wapello County, Joel D. Yates, Judge.

An applicant appeals the denial of his application for postconviction relief. **AFFIRMED**.

William Monroe, Burlington, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered without oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**GREER, Presiding Judge.**

After he assaulted his girlfriend and his housemate, a jury found Johnnie Boutchee guilty of four counts: attempted murder, a class "B" forcible felony; willful injury causing serious injury, a class "C" felony with an habitual offender enhancement; willful injury causing serious injury, a class "C" felony with an habitual offender enhancement; and going armed with intent, a class "D" felony with an habitual offender enhancement. Boutchee directly appealed, and his convictions were affirmed. *State v. Boutchee*, No. 17-1217, 2018 WL 3302010, at *1–2 (Iowa Ct. App. July 5, 2018).

In his postconviction relief (PCR) application, and now in this appeal following the denial of his application, Johnnie Boutchee alleged his trial counsel was ineffective by failing to (1) object to a medical provider's "prejudicial" testimony that related to an assault victim's injuries that the medical provider treated five days after the criminal incident at issue occurred and (2) lodge an objection to the racial composition of the jury pool.

On both claims, we find Boutchee could not establish proof of ineffective assistance by his trial counsel. We affirm the denial of his PCR application.

**I. Background Facts and Proceedings.**

Boutchee's convictions stem from a violent assault on two individuals, J.R., his housemate, and T.T., his girlfriend. On direct appeal, a panel of this court described the underlying facts as follows:

> Boutchee called 911 around 5 a.m. on December 5, 2016, telling the dispatcher his girlfriend was having a medical emergency and "needs some help." When paramedics arrived, they discovered two people who needed help. Not only was Boutchee's girlfriend, T.T., bleeding from multiple stab wounds in the bedroom. But in the

living room, paramedics found J.R., bloody and barely conscious, on the floor. J.R. had visible head injuries and a laceration on his wrist. Safely in the ambulance, J.R. identified Boutchee as his attacker.

Boutchee and his girlfriend had been out partying the night before. Boutchee was arrested, but returned home early in the morning. . . . Then Boutchee moved back and forth between the bedroom and living room, where J.R. had been sleeping on the couch. Boutchee took a metal baseball bat from beside the TV stand and twirled it around. Boutchee told J.R. "how much he hated" him and punched J.R. in the face with his fists and "started smashing" him with the bat, according to J.R.'s testimony. J.R. estimated Boutchee hit him more than two dozen times "all over his head." . . .

. . . .

. . . Boutchee slashed the knife near T.T.'s throat and stabbed her several times in her neck and head. As she struggled to stay alive, T.T. convinced Boutchee to call 911. . . .

In addition to his head and wrist injuries, J.R. suffered pelvic fractures and a lacerated spleen, which were not detected by medical personnel until he returned to the hospital a week after the assault. When Dr. Gregory Casey saw J.R. in the Ottumwa emergency room on December 11, 2016, he ordered a CAT scan revealing the pelvic fractures and "a pretty significant" injury to the patient's spleen, which required continuing observation to ensure it did not bleed to the point of requiring surgery.

For his attack on J.R., the State charged Boutchee with attempt to commit murder, a class "B" felony, in violation of Iowa Code section 707.11(1) (2016), and willful injury causing serious injury, a class "C" felony, in violation of Iowa Code section 708.4(1). For his attack on T.T., the State charged Boutchee with a second count of willful injury causing serious injury. For his conduct of shuttling between the two victims—knife in hand—the State charged Boutchee with going armed with intent, a class "D" felony, in violation of Iowa Code section 708.8. The State added habitual-offender enhancements to all the felonies but the attempted murder. A jury returned guilty verdicts on all counts. The district court sentenced Boutchee to a combination of consecutive and concurrent terms of incarceration not to exceed forty years.

*Boutchee*, 2018 WL 3302010, at *1–2. This court affirmed his convictions on direct

appeal, finding his claims regarding the sufficiency of the evidence and ineffective

assistance of counsel to be meritless[1] and his claim about restitution to be premature.

Boutchee applied for PCR on September 21, 2018. After successive continuances, the PCR trial took place on March 28, 2024, and the district court denied his application for PCR on May 10, 2024, finding both claims to be meritless. Boutchee appeals.

## II. Standard of Review.

We review ineffective-assistance-of-counsel claims de novo. *State v. Lilly*, 930 N.W.2d 293, 298 (Iowa 2019).

## III. Discussion.

Boutchee makes two ineffective-assistance-of-counsel arguments on appeal. First, he argues that his trial counsel was ineffective for not objecting to Dr. Casey's testimony, which was irrelevant and prejudicial. Second, he argues counsel was ineffective for failing to lodge a fair-cross-section challenge to the jury pool.

"To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). "However, both elements do not always need to be addressed. If the

---

[1] In the direct appeal, Boutchee urged that the testimony of Dr. Casey was improper expert testimony because it "was, in effect, an expert opining that [J.R.] was to be believed." *Boutchee*, 2018 WL 3302010, at *4 (alteration in original). Our court found the vouching challenge to Dr. Casey's testimony to be meritless and stated, "Boutchee's attorney had no cause to urge a useless objection to the doctor's testimony." *Id.*

claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142.

To show ineffective assistance, the applicant must "demonstrate the attorney performed below the standard demanded of a reasonably competent attorney." *Id*. "Trial counsel has no duty to raise an issue that has no merit." *Millam v. State*, 745 N.W.2d 719, 721–22 (Iowa 2008) (citation omitted). "We presume the attorney performed competently, and the applicant must present 'an affirmative factual basis establishing inadequate representation.'" *Id.* at 721 (citation omitted). "[S]trategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment." *Ledezma*, 626 N.W.2d at 143*.*

"Once the applicant proves ineffective assistance, it must also be shown that the error caused prejudice." *Id.* To show prejudice, the applicant "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

## A. Doctor's Testimony.

Boutchee argues the injuries found by Dr. Casey, pelvic fractures and a lacerated spleen, were not a result of Boutchee's actions but were caused by J.R.'s subsequent fall—days after the assault. And because Dr. Casey was not the treating physician the day of J.R.'s assault, when he was hospitalized for head and wrist injuries, Boutchee argues the doctor's opinions were irrelevant and prejudicial to the issues raised at trial. In addition, because the State did not use the words

"relevant," "relevance," or "irrelevant" in the PCR brief, Boutchee argues the State waived making any challenge to that point and now cannot argue the testimony was relevant.

We start with the district court's PCR ruling related to Dr. Casey's testimony:

> Mr. Boutchee claims that Dr. Casey's testimony at trial was inappropriate because the doctor examined the victim some five days after the original assault took place. The Court is aware of no artificial timeline which prohibits doctors from examining and then providing an opinion as to the injuries. Interestingly, [Boutchee] cites no authority whatsoever for their position. Finding no merit in the claim that Dr. Casey should have been prevented from testifying, the Court denies that portion of the Application.

The district court made no reference to Boutchee's arguments that Dr. Casey's testimony was irrelevant or caused Boutchee prejudice, but it did discuss that Boutchee claimed the testimony was "inappropriate." But, in his PCR brief, Boutchee framed his challenge to Dr. Casey's testimony by simply stating that "[a]ny and all determination of injuries five (5) days after the initial emergency room visit was clearly prejudicial and irrelevant" with no other development. The State responded to the arguments in Boutchee's PCR brief by asserting:

> [T]here was no legal basis to bar Dr. Casey's testimony. [Boutchee] claims that Dr. Casey could not have testified about the victim's injuries because Dr. Casey examined the victim around five days after the assault. Doctors routinely testify about injuries that are examined after they are obtained. There is no legal basis for a cutoff for testimony after five days. [Boutchee's trial counsel] had no basis to object to Dr. Casey's testimony on that ground.

We find that the State addressed the argument presented—the delay in diagnosis five days after the incident did not bar testimony over what injuries J.R. suffered from Boutchee's assault of him, and that delay did not make the evidence irrelevant. The PCR court's analysis followed the State's position and, even if the

term "relevance" was not in the ruling, the overall thrust of the argument was addressed by all parties; error was preserved. *See State v. Paredes*, 775 N.W.2d 554, 561 (Iowa 2009) ("[W]here a question is obvious and ruled upon by the district court, the issue is adequately preserved.").

Turning to the claim over the admission of Dr. Casey's testimony, Boutchee maintains the testimony was irrelevant and its admission prejudiced his case. But he does not specifically argue that trial counsel breached an essential duty by not objecting. And while trial counsel did not object to Dr. Casey's testimony, he engaged in a vigorous cross-examination of Dr. Casey related to the origin of the injuries. Dr. Casey testified that he examined J.R. after he entered the emergency room complaining of "pelvic pain and difficulty walking and was later found to have some abdominal pain also." After examination, J.R. was diagnosed with "pelvic fractures . . . and . . . a splenic rupture." The pelvic fractures were "anterior and posterior"; J.R. had several fractures on both the front and back side of his pelvis. Dr. Casey opined on the origin of these injuries:

> Q. Now, Doctor, when you evaluated [J.R.], you understood that he had been in the emergency room several days prior for treatment of an assault; correct? A. That's correct.
> Q. In your opinion, would these injuries be consistent with having been received in an assault? A. Yes.

Given that trial record, any objection to Dr. Casey's testimony would have been denied. Relevant evidence "make[s] a fact more or less probable than it would be without the evidence." Iowa R. Evid. 5.401(a). "Evidence is relevant if it can 'throw any light upon the matter contested.'" *State v. Buelow*, 951 N.W.2d 879, 885 (Iowa 2020) (citation omitted). Dr. Casey testified J.R.'s injuries were attributable to the assault, and the State solicited his testimony to show the severity of the

assault and the seriousness of the injury. "Iowa has adopted a broad view of relevancy, and it is a legal question lying within the broad discretion of the trial court." *State v. Canady*, 4 N.W.3d 661, 669 (Iowa 2024) (cleaned up). Counsel has no duty to raise a meritless claim. *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003). "In situations where the merit of a particular issue is not clear from Iowa law, the test 'is whether a normally competent attorney would have concluded that the question . . . was not worth raising.'" *Id.* (citation omitted).

Finally, as to any claims of prejudice, we find trial counsel's PCR testimony persuasive when asked if he believed Dr. Casey's testimony was prejudicial to Boutchee:

> I don't. The facts of the case were pretty undisputed and gruesome, both. The facts of the matter were that Mr. Boutchee contacted 911 when there was no other person to, you know, I guess, be held accountable for the injuries to both [T.T.] and [J.R.]. Both [T.T.] and [J.R.] said Mr. Boutchee attacked them. [J.R.] testified that as Mr. Boutchee was attacking him, he was telling him why don't you just die; why don't you hurry up and die; I got things to do, things of— comments along that nature.
>
> In addition, [J.R.] was cut to the bone from his elbow to his wrist. It was one of the most gruesome injuries I've seen somebody live through. I don't think that whatever injury he had to his pancreas or internally drove the jury's decision in any manner whatsoever.

As a final note, Boutchee failed to detail in his appellate briefing how testimony related to the injuries of J.R., discovered five days later, was prejudicial.

Dr. Casey's testimony easily clears the relevancy threshold. Any relevance objection at trial would have been meritless. So, trial counsel did not breach the duty of a reasonably competent attorney, and the first prong of the *Strickland* analysis fails. *See Ledezma*, 626 N.W.2d at 142; *Strickland*, 466 U.S. at 686. We need not consider the prejudice prong. *See State v. Ondayog*, 722 N.W.2d 778,

784 (Iowa 2006) ("[The applicant]'s ineffective-assistance claim fails if he is unable to prove either element of this test.").

## B. Fair Cross Section.

Boutchee's second claim relates to trial counsel's failure to object to the racial composition of the jury pool. No African Americans were part of Boutchee's jury panel. "Under Iowa's jury-selection statutes, a jury 'pool' (i.e., venire) consists of all persons who are summoned for jury service and who report. A jury 'panel' consists of 'those jurors drawn or assigned for service to a courtroom, judge, or trial.'" *State v. Plain*, 898 N.W.2d 801, 821 n.5 (Iowa 2017) (internal citations omitted); *see also* Iowa Code § 607A.3(6) (defining "jury pool" as "the sum total of prospective jurors reporting for service"), (10) (defining "jury panel" as "those jurors drawn or assigned for service to a courtroom, judge, or trial"). A defendant's right to have their jury drawn from a fair cross-section of the community applies to the jury pool. *See State v. Wilson*, 941 N.W.2d 579, 593 (Iowa 2020).

On the day of Boutchee's criminal trial, three African-American potential jurors were "summoned" to be part of the jury pool of eighty but did not "report." And as the State notes in its appellate brief, trial counsel understood that African Americans comprised 3.65% of the overall population of Wapello County[2] and, the State maintains, Boutchee correctly calculated that a *summoned* jury pool of eighty people that contained three African-Americans was 3.75% African American. But,

---

[2] The prosecutor used this percentage in his briefing below. On appeal, the State suggests that the appropriate figure is the prevalence of African Americans among *jury-eligible* residents, which it maintains is an even smaller percentage of the overall population. We continue to use the percentage that was advocated for in and considered by the district court.

only one African-American potential juror showed up to jury selection, along with seventy other people, constituting only 1.43% of the jury pool; so Boutchee argues his trial counsel had a duty to make a fair-cross-section challenge.

To show a violation of the fair-cross-section requirement, under *Duren v. Missouri*, 439 U.S. 357, 364 (1979), an individual must establish:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Under the first prong, neither party contests that African Americans are a distinctive group in the community. *See, e.g.*, *State v. Veal*, 930 N.W. 2d 319, 329 (Iowa 2019). As to the second and third prongs, the State contends the record foreclosed any evidence of underrepresentation as to the second prong and the PCR court concluded Boutchee failed to show that any underrepresentation was due to systematic exclusion of a particular group under the third prong.

Even if Boutchee's arguments concerning the second prong of the fair-cross-section test were successful, without the requisite showing related to the third prong, Boutchee's fair-cross-section challenge would fail. Failure to prove one prong of the *Duren/Plain* test is fatal to the entire fair-cross-section claim. *State v. Lilly*, 969 N.W.2d 794, 797 (Iowa 2022) ("We will begin our analysis on the third prong, since an inability to establish any one of the three *Duren/Plain* elements is fatal to a defendant's fair-cross-section challenge."). And although Boutchee's focus on appeal is that the representation of African Americans in the pool of individuals that *reported in person* to jury selection—the jury pool—was a

"significant deviation" from the representation of African Americans in the community, here, the group of individuals *summoned* to for jury duty slightly overrepresented the African Americans in the county.

Going back to the second prong, in this matter, eighty individuals were summoned for jury duty. Of the eighty, three individuals were African American, only one of the three reported for jury duty.[3] The State argues "[t]he jury pool that returned the questionnaires *over*represented African-Americans, even using the 3.65% figure that [trial counsel] found for the overall population of Wapello County (and not the figure for the jury-eligible population, which is lower)." But, we look to those potential jurors who were summoned and reported as those making up the jury pool. Even if we look at the representation of the jurors that made up the pool on the day of trial (seventy potential jurors, only one of which was African

---

[3] Although not specifically addressing trends in Iowa or any specific representative group, one author recently addressed the failure of jurors to report for duty and opined that:

> As recently as 2007, the average nonresponse/failure to appear (FTA) rate for jury summonses was 9 percent, a rate that varied considerably from court to court depending on operational practices and community characteristics. Over the next decade, however, nonresponse and FTA rates increased dramatically. By 2019, NCSC reported that the average nonresponse rate for qualification questionnaires was 17 percent for two-step courts and the average nonresponse/FTA rate for jury summonses was 14 percent for one-step courts. The pandemic exacerbated these trends, increasing nonresponse rates in two-step courts to 22 percent and nonresponse/FTA rates in one-step courts to 16 percent by 2021-2022.

Paula Hannaford-Agor, *Rebuilding the Foundation: Addressing a Crisis in Juror Participation*, Trends in State Courts 2025, 2025, at 84, 85 (internal citations omitted). "Several decades of underinvestment in civics in K-12 education has left many citizens uninformed about the basic principles on which the nation was founded. *Id.* at 86 (citation omitted). "As a result, many Americans no longer fully understand how jury service checks arbitrary power, legitimizes the rule of law, and ensures that court judgments reflect community perceptions of justice." *Id.*

American), we agree with the State that Boutchee could not meet his burden under the second prong.

If we consider those who reported for jury service, which here was one African American out of seventy individuals, the threshold required by our caselaw is one standard deviation or more before the distinctive group makeup of the jury pool is to be underrepresented. In *Lilly*, our supreme court found that any one distinctive group in a jury pool should not be more than one standard deviation away from its prevalence in the overall population. 930 N.W.2d at 304 ("On our review, we conclude the threshold should be one standard deviation—in other words, the percentage of the group in the jury pool must be one standard deviation or more below its percentage in the overall population of eligible jurors."). The State offered this calculation:

> Standard deviation would be computed as $\sqrt{(0.0365*(1-0.0365)*70)}$, or 1.569. And the expected average level of representation—3.65% of 70 people—would be 2.55 people. The actual level of African-American representation (1 person) is less than one standard deviation below the expected average (because it's greater than 2.55–1.569, or 0.981).

We accept that math and find that the jury pool was neither unfair or unreasonable given the parameters we are to apply. *See id.* And as trial counsel testified at the PCR trial, the difference between the Wapello County composition and the pool that arrived for trial was "not significant enough to raise a challenge."

A claim under the second prong of the fair-cross-section analysis would be meritless because Boutchee's trial counsel could not make a showing the representation of African Americans in the jury pool was not fair and reasonable in comparison to the general population of Wapello County. An attorney has a duty

to act as a reasonably competent attorney. *Graves*, 668 N.W.2d at 881 ("The court measures defense counsel's performance by standards consistent with prevailing professional norms." (cleaned up)). "Trial counsel has no duty to raise an issue that has no merit." *Id.* As a result, we find that Boutchee's trial counsel had no duty to raise a fair-cross-section claim, and, as a result, no breach occurred. The *Strickland* analysis requires a showing of both breach and prejudice for a successful claim of ineffective assistance of counsel—failure to establish either prong dooms the PCR claim. *Ledezma*, 626 N.W.2d at 142. Boutchee's second ineffective-assistance-of-counsel claim fails.

## IV. Conclusion.

Because Boutchee failed to establish his trial counsel provided ineffective assistance on either of his claims, we affirm the district court's denial of the PCR application.

**AFFIRMED.**